IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

EMMETT COLEMAN,                    )
     Plaintiff,                  )
                          )        Civil Action No. 11-1457
     v.                          )        United States Magistrate Judge
                          )        Cynthia Reed Eddy
PENNSYLVANIA STATE POLICE,          )
     Defendant.                  )

**MEMORANDUM OPINION**

## I.    Introduction

Emmett Coleman brought suit against his former employer, the Pennsylvania State Police ("PSP"), pursuant to the Rehabilitation Act of 1973, 29 U.S.C. § 794(a) (Count I); Title II of the Americans with Disabilities Act, 42 U.S.C. § 12133 (Count II); and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5 (Count III).[1] Amended Complaint, (ECF No. 22), at ¶¶ 31-46. Plaintiff claims PSP terminated him because he developed post-traumatic epilepsy or seizure disorder[2] during his eighteen month probationary training period, and failed to make reasonable accommodations for his disability in violation of the Rehabilitation Act and Title II of the ADA. Plaintiff also claims he was terminated because he is African-American, in violation of Title VII, and that white troopers with similar disorders received more favorable treatment, i.e., long term or indefinite limited duty as an accommodation.

---

[1]  The amended complaint also asserted a cause of action at Count IV under the Pennsylvania Human Relations Act, 43 Pa.C.S. § 955 *et seq*., which plaintiff voluntarily withdrew in response to PSP's Motion to Dismiss Count IV (ECF No. 23). *See* Notice of Voluntary Withdrawal (ECF No. 25).

[2]  "Epilepsy is a seizure disorder. A person with epilepsy has had two or more unprovoked seizures, regardless of seizure type. There are many types of epilepsy, depending on age of onset, seizure type(s), EEG findings, family history, and neurological history, among other factors." NYU Comprehensive Epilepsy Center, http://epilepsy.med.nyu.edu/epilepsy/what-epilepsy. This opinion will use the terms "epilepsy" and "seizure disorder" interchangeably.

On February 2, 2012, this Court entered a Memorandum Order (ECF No. 19) denying as premature Defendant's Motion to Dismiss Count II on the grounds that an employment discrimination claim by an individual is not cognizable under Title II of the ADA, finding it "inappropriate to decide this legal issue in a vacuum, in the absence of discovery that will likely 'flesh out' the various claims and inform the Court's determination of this legal issue in a more meaningful manner. . . . in a motion for summary judgment at the appropriate time." *Id.* at 2-3. Following discovery, PSP filed a Motion for Summary Judgment (ECF No. 33) renewing its legal argument against application of Title II of the ADA in Count II to employment discrimination claims by individuals, and seeking to dismiss Counts I and III on the basis that there are no genuine issues of material facts as to essential elements of the Rehabilitation Act and Title VII claims.

After careful consideration of the motion for summary judgment and response, the excellent briefs in support and in opposition, the respective concise statements and counter statements of material facts, and the comprehensive documentary and testimonial record supplied by the parties in their appendices, the Court finds no genuine dispute of material fact regarding (1) whether Plaintiff was "otherwise qualified to perform the essential functions" of a PSP full status trooper (he was not); (2) whether PSP could have made reasonable accommodations that would have allowed him to become "otherwise qualified to perform the essential functions" (it could not have); and (3) whether PSP treated similarly situated white persons with seizure disorders more favorably (it did not). The Court also finds that Title II of the ADA does not

provide Plaintiff a private right of action in the employment context. Summary judgment must therefore be granted in Defendant's favor on all claims.[3]

## II.      Statement of the Facts

Given the comprehensive concise statements and counter-statements of facts and the substantial documentary and testimonial evidence set forth in the appendices, there is surprisingly little dispute over historical facts, although the parties vigorously debate the significance of those facts to Plaintiff's ability to perform the essential functions of a PSP trooper.

The underlying dispute is over conflicting medical *opinions* offered by the parties to support their respective positions as to whether Plaintiff's post-traumatic seizure disorder rendered him unqualified to perform the essential functions of a PSP trooper, and over which doctor's medical opinion should be credited by this Court. More broadly, the dispute is over PSP's employment policies related to epilepsy/seizure disorders and the risks associated with performance of the full range of trooper duties, including many "critical duties," by an individual diagnosed with such disorder, particularly as applied to Mr. Coleman's termination pursuant to PSP's Seizure Protocol and the manner in which it made its assessment of Plaintiff's condition

---

[3] Under the Federal Magistrate Judges Act ("the Act), a Magistrate Judge has full jurisdiction over a case if all parties consent. 28 U.S.C. § 636(c) ("[u]pon consent of the parties, a full-time United States magistrate judge . . . may conduct any or all proceedings in a jury or nonjury civil matter and order the entry of judgment in the case, when specially designated to exercise such jurisdiction by the district court." 28 U.S.C. § 636(c)(1)).  Consent of all parties to a case gives the magistrate judge full "authority over dispositive motions, conduct of trial, and entry of final judgment, all without district court review." *Roell v. Withrow*, 538 U.S. 580, 585 (2003); *In re Search of Scranton Hous. Auth.*, 487 F.Supp.2d 530, 535 (M.D.Pa. 2007). "[S]o long as consent [to Magistrate Judge jurisdiction] is clear and unambiguous, it is effective." *Scranton Hous. Auth.*, 487 F.Supp.2d at 535; *Roell*, 538 U.S. at 591 (consent may be inferred from parties' actions). Mr. Coleman and the PSP have each consented to the Magistrate Judge's jurisdiction. (ECF Nos. 10, 11). Each party's election of Magistrate Judge option form states: "I voluntarily consent to have a United States Magistrate Judge conduct any and all further proceedings in the case, including trial and entry of a final judgment, with direct review by the United States Court of Appeals for the Third Circuit if an appeal is filed." *Id*.

and the safety risks his condition posed to him, fellow troopers and the public in the event he experienced another seizure while performing critical duties.

## A. State Police Academy and Probationary Field Training – Qualification Standards

In order to become an active, full-fledged PSP trooper, candidates must successfully complete an eighteen month probation period as an express condition of graduation, which consists of six months training and academic instruction as a cadet at the Pennsylvania State Police Academy, and twelve months field training in the full range of state trooper duties, including all critical duties. During this mandatory twelve month field training period, each probationary trooper is assigned a full status state trooper as "coach" in a normal field setting, and must undergo extensive and varied training, with frequent assessments and evaluations, to determine whether he or she can meet the rigorous physical and mental challenges of all duties regularly encountered by a PSP trooper.

Upon completion of the eighteen month probation period, the candidate's evaluations are reviewed by a probationary review panel, which makes a recommendation to retain or to seek further review at a higher level of authority. Ultimately it is the PSP Commissioner who makes the final determination to retain any probationary trooper for activation to full duty status, or to dismiss the candidate from further service.

PSP has never waived nor made an exception to the twelve month field training prerequisite to becoming a full-fledged state trooper for any probationary trooper, although it has offered temporary limited duty work to injured probationary troopers while extending their probationary periods. However, time performing such temporary limited duty does not count toward completion of the mandatory twelve month field training period, and PSP has never extended probation on a long term or indefinite basis.

4

Emmett Coleman graduated from the Academy in December 2008, and became a probationary state trooper assigned to the Troop J, Avondale barracks under the supervision of Troop J's commanding officer, Captain Brenda Bernot. According to Captain Bernot, and apparently everyone who worked with Mr. Coleman and everyone in the command structure who knew anything about him, he was an outstanding, competent and highly professional candidate who likely would have met the qualifications standards to become an excellent PSP trooper, were it not for his post-traumatic epilepsy/seizure disorder. Unfortunately, almost nine months into his probationary field training period, on July 26, 2009, Plaintiff was involved in an off-duty car accident and suffered serious head trauma.

**B.  The Injuries and Impact on Plaintiff's Probationary Field Training**

As a result of his accident, Mr. Coleman suffered a traumatic brain injury and multiple facial fractures. Mr. Coleman took a medical leave of absence from July 26, 2009 through October 28, 2009, and then returned to work in a limited duty capacity at the Avondale barracks. PSP agreed to extend his probationary period. Consistent with PSP's customary practice, the temporary limited duty was not credited toward the twelve month field training prerequisite for graduation to full-fledged trooper status.

On December 31, 2009, Plaintiff returned to work in a full duty capacity, without restrictions. On February 1, 2010, Mr. Coleman suffered a "generalized tonic-clonic seizure" also known as a grand mal seizure or a convulsion, with loss of consciousness, stiffening and shaking of both sides. Defendant's Appendix in Support of Motion for Summary Judgment ("Defendant's Appendix"), Exhibit 15, Dr. Sperling Deposition Transcript and Report (ECF No. 36-15), at 13 of 44. Plaintiff's treating neurologist, Dr. Heidar K. Jahromi, M.D., prescribed the anti-seizure medication Keppra, at 750 milligrams, twice daily. Plaintiff's Appendix to Response

in Opposition to Motion for Summary Judgment ("Plaintiff's Appendix"), Exhibit 23, Dr. Jahromi Letter of June 21, 2010 (ECF No. 42-4), at 23 of 61.

Mr. Coleman suffered another life threatening series (five or six) of grand mal, tonic-clonic seizures on April 5, 2010, while visiting family in Pittsburgh, and was hospitalized at the University of Pittsburgh Medical Center-Presbyterian Hospital for three days. Plaintiff's Appendix, Exhibit 16, Coleman Deposition Transcript (ECF No. 42-3), at 58-59 of 63. Dr. Jahromi added Dilantin to Plaintiff's medication, and doubled his dosage of Keppra to 1500 milligrams twice daily, the maximum dosage. Defendant's Appendix, Exhibit 16, Dr. Jahromi Letter of April 29, 2010 (ECF No. 36-16), at 2 of 5.

Dr. Jahromi again released Plaintiff for limited duty work, and PSP permitted him to return to limited duty work with another extension of his probationary period that was not credited toward his twelve month field training. The probationary period was extended a total of seventeen months, according to PSP; thirteen and one-half months, according to Plaintiff. In any event, the parties agree that Plaintiff completed eight months and three weeks of his requisite twelve month field training. Defendant's Concise Statement of Material Facts (ECF No. 34), at ¶30; Plaintiff's Response to Defendant's Concise Statement of Material Facts (ECF No. 41), at ¶30.

While being weaned from Dilantin, in August 2010, Plaintiff suffered another seizure at home while asleep (which he did not report until November, 2010, *see* Plaintiff's Appendix, Exhibit 16, Emmet Coleman Deposition Transcript(ECF No. 42-3), at 60-61 of 63), even though he was taking the maximum dose of Keppra.  Dr. Jahromi replaced the Dilantin with Vimpat, a newer anticonvulsant drug with less of a track record, to the Keppra. In February, 2011,

immediately prior to termination, Plaintiff remained on 1500 milligrams of Keppra, twice daily, and 200 milligrams of Vimpat. *Id.* (ECF No. 42-3), at 48-49 of 63.

### C.  The Medical Opinions and Record

#### 1.  Dr. Heidar K. Jahromi, M.D.

Plaintiff's primary care physician, Dr. Lawrence Alwine, D.O., referred him to a neurologist, Dr. Jahromi. Dr. Jahromi first saw Plaintiff on March 4, 2010, and diagnosed him with post-traumatic epilepsy stemming from the accident which caused "bilateral encephalomalacia involving inferior aspect of frontal lobe." Defendant's Appendix, Exhibit 16, Dr. Jahromi Letters of March and April, 2010 (ECF No. 36-16), at 2 of 5; Plaintiff's Appendix, Exhibit 19, Dr. Jahromi Deposition Transcript(ECF No. 42-4), at 17 of 61. In his April 19, 2010 letter to Dr. Alwine, Dr. Jahromi stated that following Plaintiff's discharge from UPMC-Presbyterian Hospital in Pittsburgh, "I had a very long discussion with him and his wife regarding the unpredictability of the seizure and the things that he should not be doing including driving, drinking, taking drugs, lack of sleep, refraining from drinking too much soda and continuation of taking for the time being, same dosage of medication . . ." Defendant's Appendix, Jahromi Letter of April 19, 2010, Exhibit 16 (ECF No. 36-16), at 2-3 of 5.

Based on his observation that Plaintiff was "cognitively intact" upon examination on June 21, 2010, and Plaintiff's account of his post-accident medical history, Dr. Jahromi opined that Plaintiff had been seizure free since April 2010. Plaintiff's Appendix, Exhibit 19, Dr. Jahromi Deposition Transcript (ECF No. 42-4), at 8 of 61. When Plaintiff had a third seizure in August, 2010, Dr. Jahromi attributed it to the Dilantin, although it could have been "just simply . . . another event without unpredictable [sic] cause." *Id*. at 10 of 61. Dr. Jahromi also testified that Plaintiff was seizure free from August 7, 2010, until his deposition, on August 10, 2012. *Id*. at 10

7

of 61.  Asked to opine as to the probability Mr. Coleman would have another seizure event, Dr.

Jahromi was hesitant to put a number on it, but eventually stated, somewhat opaquely, that the

likelihood of Plaintiff experiencing additional seizure episodes was "[o]ne percent, 2 percent, 3

percent – I have no idea.  I don't think anybody knows. . . . [It would not be] 50 percent chance.

It would be very less likely." *Id.* at 15 of 61.

### 2.  Dr. Michael R. Sperling, M.D.

Dr. Michael R. Sperling, M.D., neurologist and epilepsy/seizure specialist, was brought

in on a late consultation by Dr. Jahromi. According to Dr. Sperling's February 8, 2011 report, as

a result of the motor vehicle accident, Plaintiff "suffered facial fractures, orbital injuries

requiring surgical repair of the orbits. He also suffered bifrontal contusions with subsequent

encephalomalacia bifrontally." Defendant's Appendix, Exhibit 15, Dr. Sperling Deposition

Transcript and Report (ECF No. 36-15), at 40 of 44. In his deposition, Dr. Sperling explained

more fully:

> Mr. Coleman . . . had facial fractures, orbital injuries, which
> are injuries to the bones around the eye, requiring surgical repair of the
> orbits. And he also injured his brain, that he had contusions of both
> frontal lobes with then subsequent encephalomalacia bifrontally
> afterwards. So that would be *bilateral scarring and damage to the
> frontal lobes*. . . . That means that areas of the brain have been
> damaged and scarred, so there's loss of normal cells. There's scarring
> in that area. Sometimes you can see fluid in areas instead of brain
> tissue; other times it might just mean that that area of the brain is
> shrunken with scar tissue. But *it's damage -- permanent damage to the
> brain with injury to the nerve cells in the brain*.

*Id*. at 12 of 44 (emphasis added).

In addition to the physical scaring and other damage, Dr. Sperling's review of Plaintiff's

MRI and EEG showed "left prefrontal sharp waves on EEG," which he stated

is a marker of ongoing irritability in the brain. It helps identify that, yes, *the area of damage* on the MRI scan *is, in fact, highly likely to be an area triggering seizures, because the sharp waves are, again, this electrical irritability*. So it says that, you know, *probably the left frontal lobe is a source of -- a potential source of seizures in him*. The fact that the MRI is abnormal and the EEG is abnormal, too, has some bearing on long-term prognosis.

*Id*. at 17-18 of 44 (emphasis added).

Dr. Sperling's diagnosis was post-traumatic epilepsy and left prefrontal sharp waves on

EEG. *Id*. at 40 of 44. According to his testimony and his written report, Dr. Sperling

had a long discussion with [Plaintiff] and his wife about the diagnosis, prognosis, and employment issues. *The fact that he failed to respond to Keppra does not augur especially well for the future*, but there is still some chance of control. I think it is reasonable to continue at Vimpat 200 mg twice daily and Keppra 1500 mg twice daily. Should he experience any relapses, I would taper away the Keppra and introduce a different drug, perhaps topiramate. He has been seizure-free for about six months and therefore he will be able to reapply for his driver's permit. However, *there is a difference between ordinary driving and working as a state trooper*. . . . Ideally, the state police would be able to find another job that does not require driving that he could fulfill, and I informed him that the employer is required to make reasonable accommodation. However, there is no assurance that his employment with the State Police will be maintained. We reviewed all of this in detail. *We also reviewed general activity restrictions, such as avoiding moving equipment, heights, and swimming without a lifeguard, etc*.

*Id*. (Written Report to Dr. Jahromi, dated February 8, 2011) (emphasis added).

Dr. Sperling opined that an individual's risk of recurrence of seizures was about 80%-

85%, and that the risk potential for an instantly debilitating seizure rose if the individual had

been on anti-seizure medication at the time of second or subsequent seizure events. *Id.* at 19-20,

29 of 44.

Although the PSP did not have the benefit of Dr. Sperling's February 8, 2011 report

before it made the determination to terminate Plaintiff, the medical records Dr. Sperling

reviewed and evaluated in reaching his conclusions were the same medical records Dr. Marrone considered in making his medical recommendations.

### 3. Dr. Michael S. Marrone, M.D. and the Seizure Protocol

PSP's Seizure Protocol was promulgated in February, 2006 by its Chief Medical Officer, Dr. Marrone, with input from Dr. Darby Hand, D.O., another of PSP's top Medical Officers, and Dr. Paul R. McCabe, M.D., Professor of Neurology at Hershey Medical Center, and an authority on epilepsy and seizure disorder. The Seizure Protocol provides:

> 1. All enlisted members/Liquor Enforcement Officers (LEO) are required to report any initial or subsequent seizure activity, onset of epilepsy or involuntary loss of consciousness.
>
> 2. Should a member/LEO member experience seizure activity, involuntary loss of consciousness or be diagnosed with epilepsy, he or she shall not be permitted to perform full duty. A member shall not be permitted to perform full duty until he or she remains seizure free for a period of 5 years, on or off anti-seizure medication or other treatment. The specific duty restrictions will be determined by the State Police Medical Officer for each individual case. Certain explained seizure activity may be excepted by the State Police Medical Officer.
>
> 3. Any member/LEO who experiences a seizure may not operate a Department vehicle until any driving operating privileges have been restored by the Pennsylvania Department of Transportation.
>
> 4. Should the member experience a subsequent seizure during the initial five year period, he or she shall not be permitted to perform full duty until he or she is seizure free for a period of 5 years from the date of the most recent seizure. Exception may be granted by the State Police Medical Officer as stated in the above paragraph.
>
> 5. In the absence of any change in the member/LEO's status/medical condition, the State Police Medical Officer will review each case annually.
>
> 6. Cadet and liquor enforcement officer applicants with a history of seizure, epilepsy or unexplained loss of consciousness may be appointed after the same five year period has elapsed.

7.  The definition of "Critical Duty" is:

Critical duty includes, but is not limited to Patrol duty; exposure to confrontational situations; duties that entail alertness, reasoning and decision-making; and communications/desk duties. Additionally, critical duty includes any activity that, if performed improperly or not at all, would place that individual, other members, liquor enforcement officers, civilian employees or the general public in danger.

Defendant's Appendix, Exhibit 5, PSP Seizure Protocol (ECF No. 36-5), at ¶¶ 1-7.

Dr. Marrone testified that he developed this protocol based upon his and Dr. Hand's consultation with epilepsy expert, Dr. McCabe, and on his and Dr. McCabe's research and review of the medical literature. The "five year seizure free" policy is based on the understanding in the medical community that for each year an individual remains seizure free after the initial seizure incident, the risk of recurrence declines, until, by five seizure free years, the risk approaches that associated with the general population. The prevailing opinion among the epilepsy/seizure specialists, derived from "evidence-based medical facts," indicates that the general population has about a two percent risk of seizure at any time, but that a person who has had one episode of seizure risks recurrence in the next year of approximately 50%, and more than one seizure event would put the individual in a 75% to 90% risk bracket of recurrence; risk probabilities rise toward the upper end of the bracket if the individual had been on seizure medication at the time of the second and subsequent episodes. Defendant's Appendix, Dr. Marrone Deposition Transcript (ECF No. 36-2), at 27-32.

Dr. Marrone further opined that use of the anti-seizure medication Keppra itself posed a safety risk because of its 15% chance of causing somnolence and confusion (according to the manufacturer of the Keppra), and the fact that it is administered every twelve hours and has a half-life of six to eight hours essentially means that the Keppra in the patient's system would

11

never reach a sub-therapeutic level. Plaintiff's Appendix, Exhibit 6, Dr. Marrone Deposition Transcript (ECF No. 42-4), at 40-42 of 65; Defendant's Appendix, Dr. Sperling Deposition Transcript (ECF No. 36-15), at 16 of 44.

With regard to Plaintiff, Dr. Marrone followed Mr. Coleman's situation and progress in 2010-11, and reviewed his medical records. Based upon Dr. Marrone's experience, medical knowledge, research concerning seizure recurrence rates, the severe and permanent brain damage, the intensity and repetitive nature of Mr. Coleman's seizures, and the fact that he had a second, serious seizure event in April of 2010 while on medication, and then a third in August while on medication, he believed Mr. Coleman's prognosis for remaining seizure free in the future was poor (consistent with Dr. Sperling's prognosis that while Plaintiff still had "some chance of control," the fact that he had a second seizure while on medication did "not augur especially well for the future.")

Dr. Marrone also testified that he discounted Dr. Jahromi's opinion that Plaintiff had been seizure free after his third episode in August 2010, because that opinion was based entirely on Plaintiff's and his wife's subjective accounts made in the context of trying to get medical clearance to perform critical duties. Dr. Marrone found the Colemans' accounts an unreliable basis for Dr. Jahromi's opinion that Plaintiff had been seizure free since that date. Plaintiff's Appendix, Dr. Marrone Deposition Transcript (ECF No. 42-2), at 50-51 of 65.

**D.  The Termination Decision**

At the outset, the Court notes that Plaintiff had a great deal of support and many advocates for his continued employment within Troop J and in his command structure. It is undisputed that he is an exceptional probationary trooper and was well on his way to becoming

an exceptional full-fledged state trooper until his accident and resulting brain damage and epilepsy/seizure disorder.

Nevertheless, in light of Dr. Marrone's medical assessment, the Human Resource Director, Ms. Kimberly Studenroth, made a recommendation for termination which was submitted through channels to the PSP Commissioner, accompanied by a thick file evidencing a great deal of time spent considering Mr. Coleman's medical condition and record, and his status within PSP. Commissioner Noonan and Deputy Commissioner Bivens addressed Mr. Coleman's situation in early 2011, placing great weight on Dr. Marrone's assessment, particularly given his occupational expertise and familiarity with the duties and responsibilities of a state trooper. Commissioner Noonan and Deputy Commissioner Bivens understood, based on the Seizure Protocol and Dr. Marrone's opinion, that Plaintiff would not be able to return to full duty, and therefore not have a chance to complete his probationary field training, until August 2015, at the earliest, assuming he had no more seizures. Noonan and Bivens also understood that the likelihood of Mr. Coleman remaining seizure free for another five years was slim, and with each new seizure, the five year clock would begin anew.

There is a contractual obligation for PSP to provide limited duty work, if available, to disabled full status troopers, but there is no such obligation for probationary troopers. Defendant's Appendix, Exhibit 4, Commissioner Noonan Deposition Testimony (ECF No. 36-4), at 8 of 12. PSP had agreed, under the existing collective bargaining agreement ("CBA") with the Pennsylvania State Troopers Association and a side agreement between PSP and the Association, to offer limited duty, if available, to injured non-probationary troopers who were full-fledged members of the bargaining unit, in a sub-unit designated "L1." Defendant's Appendix, Exhibit 2, HR Director Kim Studenroth Deposition Testimony (ECF No. 36-3), at 32-33 of 63.  Plaintiff

argues that the CBA also applies to probationary troopers, who are in a "L6" sub-unit within the Association, and it appears that it does, at least in some respects. *Id.* However, limited duty for non-probationary troopers derives from the side agreement, which did not apply to "L6" probationary troopers. Plaintiff does not offer any evidence to show that probationary troopers are covered by the side agreement or that any probationary trooper had ever been given indefinite or permanent limited duty.

PSP does not have a standing "limited duty" position for injured or disabled troopers or probationary troopers. In the Commissioner's view, the prospect of extending long-term (possibly permanent) limited duty to a probationary trooper presented a serious operational problem for PSP that would compromise its ability to perform its mission. PSP has a complement of troopers that is fixed by statute and further limited by budget restrictions, so the number of full status troopers was not unlimited. For purposes of the complement and budget, a member on limited duty performing administrative or clerical/filing tasks counts as a full trooper and takes up a slot within the allotted complement. Commissioner Noonan believed that by allowing a probationary trooper unlimited limited duty, he would be taking a full status trooper slot from within the troop and filling it with someone who could not perform the full range of duties expected of a PSP trooper, possibly for decades.

Limited duty is a temporary measure. There is no guarantee of any specific limited duty position. If limited duty is available, it is to be offered on a first-come, first-serve basis; if limited duty is not available at the assigned station or within a fifty mile radius, a trooper would have to use leave options, consider disability retirement or explore other retirement options. PSP also asserts, and Plaintiff does not dispute, that the contractual provisions for limited duty for full members have placed a burden on PSP over the years, which at any given point, has between 60

and 120 members on limited duty, with 20 to 30 on permanent or long-term limited duty, at a cost of approximately $120,000 per member (including salary and benefits).

The 60 to 120 troopers are paid as full status troopers but are not available to perform the critical duty functions of a trooper, which has a detrimental impact on operations because the PSP cannot replace an injured member who goes on limited duty with an able-bodied trooper. When Troop stations have one or more members on limited duty, they must make do with less manpower; fewer full status troopers means fewer members on shifts, fewer members available for back up, increased costs for overtime, and increased response times, all of which can impact negatively on the ability to respond effectively and timely to emergency and life threatening situations. Trooper shortages can be "particularly problematic" in small stations which have thirty or fewer assigned troopers.

If placed on limited duty, Mr. Coleman would still have to complete the probation process if and when he was seizure free for five years and either not taking anti-seizure medications or having its use excepted by the PSP Medical Officer, and after such an extended absence from performing critical duty functions, PSP might require him to repeat Academy training. (Plaintiff disputes that he would be required to repeat Academy training under those circumstances, but not that he would still need to complete the probationary field training remaining, approximately three months.)

Several termination notices were issued to Mr. Coleman to enable him to seek disability retirement while he was still employed, an option that was available to him even as a probationary trooper, and he was also offered the option of pursuing civilian employment with PSP. Plaintiff did not accept either option.

Accordingly, on January 24, 2011, Ms. Studenroth wrote to Mr. Coleman terminating his employment effective February 4, 2011. Plaintiff's Concise Statement of Material Facts, (ECF No. 40), at ¶99. Nevertheless, on January 27, 2011 Dr. Jahromi submitted a "diagnosis and prognosis" form, releasing him to work full duty effective February 7, 2011. Commissioner Noonan considered Dr. Jahromi's diagnosis and prognosis, and asked Dr. Marrone to reconsider in light of Dr. Jahromi's release, but neither the doctor nor the Commissioner believed it undermined Dr. Marrone's medical and risk assessment.  On February 10, 2011, Ms. Studenroth issued an amended correspondence, terminating Plaintiff's employment effective February 18, 2011.

### III. Motion for Summary Judgment and Legal Standards

### A.  Motion for Summary Judgment and Response

PSP asserts that Plaintiff cannot meet his burden of proving a necessary element of his Rehabilitation Act claim because, although Plaintiff was an exemplary and capable probationary state trooper by all accounts, his post-traumatic epilepsy disorder and medication regimen posed an unacceptably high risk of catastrophic injury to himself, other troopers and the public were he to suffer a seizure while performing critical duties, and therefore he is not otherwise qualified to perform essential critical functions of a full-fledged or probationary PSP trooper. Further, PSP argues there are no reasonable accommodations available, acceptable to Plaintiff, that would permit him to fulfill his mandatory probationary field training in order to qualify to become a full status PSP trooper or that would render him capable of performing the essential functions of a full-fledged or probationary trooper. PSP's motion for summary judgment also challenges the applicability of Title II of the ADA to disability discrimination claims in the employment context,[4] and denies liability under Title VII on the grounds that Plaintiff's race played no role in the decision to terminate him, and no similarly situated white probationary troopers were given accommodations to allow them to become full status PSP troopers.

Mr. Coleman counters that PSP fired him because of his post-traumatic seizure disorder, based upon an impermissible blanket application of its "Seizure Protocol" which prohibits state troopers and probationary troopers with seizure disorders from performing critical duties until

_____

[4] Plaintiff could not sue PSP under Title I of the ADA because states and their agencies have sovereign immunity under the Eleventh Amendment for claims for monetary damages. *Bd. of Trustees v. Garrett*, 531 U.S. 356, 360 (2001). *See also Vacek v. Pennsylvania Judicial Conduct Bd.*, 2010 WL 3338809 (W.D.Pa. 2010) (claims against the Pennsylvania State Police must be dismissed because it is an arm of the Commonwealth entitled to Eleventh Amendment immunity).  However, "Congress expressed its unequivocal intent to abrogate state sovereign immunity when it enacted Title II of the ADA," *Mohney v. Pennsylvania*, 809 F.Supp.2d 384, 393 (W.D. Pa. 2011), which prohibits discrimination against individuals with disabilities in the area of public services, programs and activities.

they were seizure free for five years. The Seizure Protocol was developed by Chief Medical Officer Marrone, who, Plaintiff claims, applied this blanket policy to Mr. Coleman without ever examining him or considering his particular situation, and without adequate deference to the opinion of Mr. Coleman's treating neurologist, Dr. Jahromi, who had released him to work unlimited duties without restrictions, including critical duties. Plaintiff also argues that Title II of the ADA does apply in an employment discrimination context, that PSP could have provided reasonable accommodations to Plaintiff because there was light duty work available that he could have performed for at least five years, and that PSP accommodated at least three white troopers with seizure disorders by assigning them to light duty work on a long-term or permanent basis. *Id*.

### B.  Rule 56(a) - Summary Judgment Standards.

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When applying this standard, the court must examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

When considering a motion for summary judgment, the court is not permitted to weigh the evidence or to make credibility determinations, but is limited to deciding whether there are any disputed issues and, if there are, whether they are both genuine and material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). All reasonable "inferences, doubts, and issues of credibility should be resolved against the moving party." *Meyer v. Riegel Prod. Corp.*, 720 F.2d 303, 307 n.2 (3d Cir. 1983). However, a mere "scintilla of evidence," without more, will not give

18

rise to a genuine dispute for trial. *Anderson*, 477 U.S. at 252. The inquiry, then, involves determining "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Brown v. Grabowski*, 922 F. 2d 1097, 1111 (3d Cir. 1990), *cert. denied*, 501 U.S. 1218 (1991) (quoting *Anderson*, 477 U.S. at 251-52). "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." *Pignataro v. Port Auth. of N.Y. & N.J.*, 593 F.3d 265, 268 (3d Cir. 2010) (citing *Reliance Ins. Co. v. Moessner*, 121 F. 3d 895, 900 (3d Cir. 1997)).

IV.    **The Claims**

**Count I.  The Rehabilitation Act of 1973**

The undisputed facts of record demonstrate that, as a matter of law, Plaintiff is not "otherwise qualified to perform the essential functions" of a PSP full-fledged or probationary trooper because of the unacceptably high risk that immediate and disastrous consequences would befall him, his fellow troopers or the public should he experience another seizure episode while performing critical functions of the position, and that no reasonable accommodation exists that would allow Plaintiff to perform those essential functions. Accordingly, Plaintiff cannot meet his burden of proof on a necessary element of his Rehabilitation Act claim.

**A.  *Prima Facie* Case**

The Rehabilitation Act, which "prohibits disability discrimination by government agencies and other recipients of federal funds," *Kralik v. Durbin*, 130 F.3d 76, 78 n. 2 (3d Cir. 1997), is interpreted consistently with the Americans with Disabilities Act. *See Emerson v. Thiel Coll.*, 296 F.3d 184, 189 (3d Cir. 2002). The substantive standards for determining liability for disability discrimination under the Rehabilitation Act and Title I of the Americans with

Disabilities Act are coextensive. *See* 29 U.S.C. §794(d); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 208 (3d Cir. 2009); *Bowers v. Nat'l Coll. Athletic Ass'n.*, 475 F.3d 524 (3d Cir. 2007).

To establish a *prima facie* case of disability discrimination under the Rehabilitation Act, or the ADA, a plaintiff must show that he: (1) has a disability; (2) is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) was nonetheless terminated or prevented from performing the job. 29 U.S.C. §794(a); *Donahue v. Consol. Rail Corp.*, 224 F.3d 226, 229 (3d Cir. 2000). If the plaintiff makes a *prima facie* showing that reasonable accommodation is possible, the burden shifts to defendant to prove, as an affirmative defense, that the accommodations requested by the plaintiff are unreasonable or would cause an undue hardship on the employer. *Id.* (citing *Shiring v. Runyon*, 90 F.3d 827, 831 (3d Cir. 1996)).

For purposes of the motion for summary judgment, PSP concedes that Plaintiff has a disability and was terminated. The sole dispute as to the Rehabilitation Act claim is whether, on the summary judgment record before the Court, a reasonable jury could find that Plaintiff was "otherwise qualified to perform the essential functions" of a PSP trooper or probationary trooper, with or without accommodations.

### B. Otherwise Qualified

"The Rehabilitation Act bars discrimination against 'otherwise qualified individuals,' but does not define that phrase." *McDonald v. Pennsylvania Dep't of Pub. Welfare*, 62 F.3d 92, 96 (3d Cir. 1995). However, the Supreme Court has provided guidance, holding that an "otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap." *Id.* (quoting *Southeastern Comm. Coll. v. Davis*, 442 U.S. 397, 406 (1979) and *School Bd. of Nassau County v. Arline*, 480 U.S. 273, 287 n. 17 (1987) ("In the employment context, an

20

otherwise qualified person is one who can perform 'the essential functions' of the job in question.")). *See* 42 U.S.C. §12111(8) ("The term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential . . . .").

Each of the *prima facie* elements is essential to an ADA or Rehabilitation Act claim, and if Plaintiff cannot satisfy the "qualified individual" prong, the Court need not address any remaining elements. *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 567 (1999). As with the other elements of a *prima facie* case, Plaintiff bears the burden of showing that he is otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation. *US Airways, Inc. v. Barnett*, 535 U.S. 391, 400 (2002).

## C.  The *Gaul* Test

Determining whether an individual with a disability is "qualified" under Title I of the ADA or the Rehabilitation Act is a two-step process. *See e.g.*, *Gaul v. Lucent Tech., Inc.,* 134 F. 3d. 576, 580 (3d Cir. 1993); *Taylor v. Phoenixville School Dist.*, 184 F. 3d. 296, 311 (3d Cir. 1999).  First, to be considered "otherwise qualified," the plaintiff must satisfy the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses and other job-related requirements. *See Skerski v. Time Warner Cable Co.,* 257 F. 3d 273, 278 (3d Cir. 2001). *See also* EEOC regulation, 29 C.F.R. §1630.2(m) ("The first step, is to determine if the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc.").  Second, if the plaintiff is able to make that showing, he or she must then establish that,

with or without reasonable accommodation, he or she can perform the essential functions of the position held or sought. *Skerski*, 275 F.3d at 278. *See also Conneen v. MBNA America Bank, N.A.*, 334 F.3d 318, 325-26 (3d Cir. 2003). "The determination of whether an individual with a disability is qualified is made at the time of the employment decision." *Gaul,* 134 F. 3d. at 580 (citations omitted).

**Step 1. Plaintiff cannot satisfy the employment experience and job-related qualification prerequisites for graduation to position of full-fledged PSP trooper**

**a.   Relevant qualification standards**

PSP maintains two qualification standards pertinent to Mr. Coleman's seizure disorder and his ability to perform the essential functions of the job of a state trooper, probationary or full-fledged. First, as an express condition of graduation, in order to become a full-fledged PSP trooper, candidates must successfully complete six months training and academic instruction as a cadet at the Academy, and twelve months field training in all state trooper duties, including all critical duties, under constant, close supervision by a full status trooper.

The twelve month field training prerequisite is mandatory and admits of no exceptions, and PSP has never waived the full twelve month field training requirement for any probationary trooper. PSP considers the full twelve month training period imperative, so that that a probationary trooper will be exposed to all critical and other duties of a PSP trooper and evaluated on his performance of those duties. Plaintiff completed almost nine of the mandatory twelve month field training when the car accident occurred and the resulting brain damage induced post-traumatic seizure disorder.

Second, PSP employs a physical qualification standard, the Seizure Protocol, which provides, *inter alia*, that a person who experiences seizure activity, involuntary loss of

consciousness or has been diagnosed with epilepsy, "shall not be permitted to perform full duty .

. . . until he or she remains seizure free for a period of five years, on or off anti-seizure

medication or other treatment." Defendant's Appendix, Exhibit 5, PSP Seizure Protocol (ECF

No. 36-5), at ¶ 2. "Certain explained seizure activity may be excepted by the State Police

Medical Officer . . . who also will determine 'specific duty restrictions . . . for each individual

case.'" *Id.* The Protocol also provides that the State Police Medical Officer will review each

case annually, and that if a trooper should "experience a subsequent seizure during the initial five

year period, he or she shall not be permitted to perform full duty until he or she is seizure free for

a period of 5 years from the date of the most recent seizure." *Id.* at ¶¶ 4, 5.  A cadet with a

history of seizure, epilepsy or unexplained loss of consciousness "may be appointed after the

same five year period has elapsed." *Id.* at ¶ 6.

    The combination of these experiential and physical qualification standards means that a

probationary trooper who can no longer participate in the mandatory twelve month field training

because he or she has a history of epilepsy, and has not been seizure free for five years from the

last episode, cannot satisfy the mandatory field training prerequisite to becoming a full-fledged

PSP trooper.

### b.  Qualification standards defense

    An employer may assert a defense to a charge of discrimination by showing its

qualification standard, test, or other selection criteria that screens or tends to screen out an

individual with a disability is job-related for the position in question and is consistent with

business necessity; and that satisfaction of its qualification standard, test, or other selection

criteria cannot be accomplished by reasonable accommodation. *See* 42 U.S.C. § 12113(a); 29

C.F.R. § 1630.15(b), (c). An employer may apply "qualification standards" for a position based

on safety considerations as long as those standards are "job-related and consistent with business necessity." *Clark v. SEPTA*, 2008 WL 219223, *8 (E.D.Pa. 2008) (citing 42 U.S.C. § 12113(a) (SEPTA uses reasonable qualification standards based on safety considerations). The standard for assessing the "business necessity" of a discriminatory passing standard or score on an entry-level police officer test is whether the passing standard "reflects the minimum qualifications necessary to perform successfully the job in question." *United States v. City of Erie*, 411 F.Supp.2d 524, 568 (W.D.Pa. 2005) (citing *Lanning v. SEPTA*, 308 F.3d 286 (3d Cir. 2002)).

In *Lanning*, the Court of Appeals for the Third Circuit held that the transit authority's screening test requiring applicants to run one and a half miles in twelve minutes was justified by business necessity. The test measured the minimum qualifications in terms of aerobic capacity necessary to successfully perform as a SEPTA transit police officer. The District Court credited a study evaluating the "correlation between a successful run time and performance on 12 job standards," which found that "individuals who passed the run test had a success rate on the job standards ranging from 70% to 90% [while the] success rate of the individuals who failed the run test ranged from 5% to 20%." *Id.* at 291. Plaintiff offered other studies to cast doubt on this statistical correlation, and argued that SEPTA's application of the run test screening failed to account for individual variations and that significant numbers of individuals would still be able to perform at least certain critical job tasks. Affirming the District Court, the Court of Appeals stated:

> It would clearly be unreasonable to require SEPTA applicants to score so highly on the run test that their predicted rate of success be 100%. It is perfectly reasonable, however, to demand a chance of success that is better than 5% to 20%. In sum, SEPTA transit police officers and the public they serve should not be required to engage in high-stakes gambling when it comes to public safety and law

24

enforcement. SEPTA has demonstrated that the cutoff score it established measures the minimum qualifications necessary for successful performance as a SEPTA officer.

308 F.3d at 292.

"Especially in the context of police officers, employers do not violate the ADA by ensuring that officers are . . . fit for duty." *Diaz v. City of Philadelphia*, 2012 WL 1657866, *11 (E.D.Pa. 2012) (quoting *Davis–Durnil v. Vill. of Carpentersville*, 128 F.Supp.2d 575, 580 (N.D.Ill. 2001)). Because police officers encounter extremely stressful and dangerous situations during the course of their work, and police departments place armed officers in positions where they can do tremendous harm if they act irrationally, "ensuring members' fitness for duty is a business necessity vital to the operation" of police departments. *Diaz*, 2012 WL 1657866 at *11 (citing, *inter alia, Watson v. City of Miami Beach*, 177 F.3d 932, 935 (11th Cir. 1999) and *Pennsylvania State Troopers Ass'n v. Miller*, 621 F.Supp.2d 246, 256 (M.D.Pa. 2008)). *See also Skinner v. Ry. Labor Exec. Assoc.*, 489 U.S. 602, 628 (1989) (upholding federal regulations allowing for the drug testing of railway employees such as train dispatchers, because employees who were subject to the tests discharge duties "fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences," among which are "great human loss").

The Court finds that PSP's Seizure Policy sets minimum medical, safety related qualifications for employment as a state trooper, and that it is a business necessity vital to the operations of its mission.

### c. Direct threat

The Rehabilitation Act provides that qualification standards "may include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace." 42 U.S.C. § 12113(b). "An employee who is a direct threat to the safety of himself or others is not a qualified individual with a disability." *Clark,* 2008 WL 219223 at *10 (citing *Rizzo v. Children's World Learning Cntr., Inc*., 84 F.3d 758, 764 (5th Cir.1996)). *See also Doe v. Woodford County Bd. of Educ.*, 213 F.3d 921, 925 (6th Cir. 2000) ("a disabled person may not be 'otherwise qualified' under both [the Rehabilitation Act and the ADA], and thus may be excluded from participation in a program, if his or her participation is a direct threat to the health and safety of others") (citing *Arline*, 480 U.S. at 287–88);  *Hennagir v. Utah Dep't of Corr.,* 587 F.3d 1255 (10th Cir. 2009) (completion of required physical safety training was "essential job function" for employee); *Johnson v. Bd. of Trustees of Boundary County School Dist. No. 101*, 666 F.3d 561, 565-61 (9th Cir. 2011) ("Johnson's lack of legal authorization to teach in Idaho rendered her unqualified pursuant to the first step of the two-step qualification inquiry" and the employer is not obligated to furnish any reasonable accommodation that would enable her to perform the essential job functions"); *Serrapica v. New York*, 708 F.Supp. 64, 73 (S.D.N.Y.), *aff'd* 888 F.2d 126 (2d Cir. 1989) ("employer is allowed to consider potential safety risks to applicants' co-worker, and others in making a decision about employment criteria").

EEOC regulation "carries the defense one step further, in allowing an employer to screen out a potential worker with a disability not only for risks that he would pose to others in the workplace but for risks on the job to his own health or safety as well." *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 78-79 (2002) (citing 29 CFR § 1630.15(b)(2)). The EEOC regulations provide that the "term 'qualification standard' may include a requirement that an individual shall

26

not pose a direct threat to the health or safety of the individual or others in the workplace. (See §

1630.2(r) defining direct threat.)" 29 CFR § 1630.15(b)(2) ("Direct threat as a qualification

standard").  Section 1630.2(r), in turn, defines "direct threat" as follows:

> Direct threat means a significant risk of substantial harm to the
> health or safety of the individual or others that cannot be eliminated or
> reduced by reasonable accommodation. The determination that an
> individual poses a "direct threat" shall be based on an individualized
> assessment of the individual's present ability to safely perform the
> essential functions of the job. This assessment shall be based on a
> reasonable medical judgment that relies on the most current medical
> knowledge and/or on the best available objective evidence. In
> determining whether an individual would pose a direct threat, the
> factors to be considered include:
>
> (1) The duration of the risk;
> (2) The nature and severity of the potential harm;
> (3) The likelihood that the potential harm will occur; and
> (4) The imminence of the potential harm.

29 C.F.R. § 1630.2(r).[5]

In a common situation analogous to PSP's Seizure Policy, courts have routinely upheld

application of the Department of Transportation's ("DOT's") physical, medical regulations with

regard to epilepsy. In *Clark v. SEPTA,* for example, the United States District Court for the

Eastern District of Pennsylvania upheld the use of DOT's epilepsy regulations by the

---

[5]   As qualification standards are defenses, the burden of proving the existence of a direct threat is
generally on the employer. *EEOC v. Hussey Copper Ltd*., 696 F.Supp.2d 505, 520 (W.D.Pa. 2010) (citing
*Clark*, 2008 WL 219223 at *10); *Jarvis v. Potter*, 500 F.3d 1113, 1122 (10th Cir. 2007) (collecting cases).
However, many federal courts recognize an exception to the general rule where "the essential job duties
necessarily implicate the safety of others," in which case, "the burden may be on the plaintiff to show that
she can perform those functions without endangering others." *Jarvis*, 500 F.3d at 1122 (collecting cases);
The essential job duties of a PSP probationary or full-fledged trooper obviously implicate the safety of
others on a routine, daily basis. The question is undecided in the Third Circuit.  See *Donahue v. Consol.
Rail Corp.*, 224 F.3d 226, 230-31 (3d Cir. 2000). The Court need not and does not decide whether to
adopt the burden-shifting "safety of others" exception, however, because assuming the burden is on the
employer, PSP offers sufficient facts to sustain the burden and to support a finding that state troopers who
are not seizure free for five years pose a direct threat to the safety of themselves and others.

Southeastern Pennsylvania Transportation Authority ("SEPTA"), which terminated Mr. Clark, a Body Mechanic 1st Class, after he developed epilepsy and was being treated with anti-seizure medication. The "Workforce Modification Committee" had determined Plaintiff was a direct threat to himself and others because of his seizure condition and medication regimen.

The essential functions of Plaintiff's position, a designated "safety sensitive" position, included inspecting and assessing collision damage and estimating the scope of necessary repair work, repairing vehicles and equipment, including the removal and installation of interior and exterior body components, cutting, fabricating, and replacing structural components, and using all types of welding, cutting, and joining equipment. Additionally, the position required employees to work at unprotected heights, drive buses, and maintain a valid Commercial Driving License.

The Court granted summary judgment in SEPTA's favor on Mr. Clark's Rehabilitation Act and ADA claims, finding he was not qualified, as a matter of law, to perform the essential functions of the safety sensitive position of Body Mechanic, reasoning as follows:

> SEPTA adheres to DOT physical standards in determining whether an individual is qualified to operate a commercial vehicle. DOT medical regulations state that a person with an "established medical history or clinical diagnosis of epilepsy or any other condition that is likely to cause loss of consciousness or any loss of ability to control a motor vehicle" is not physically qualified to drive a commercial motor vehicle. 49 C.F.R. § 391.41(b)(8). DOT's interpretation of these regulations (found in the Medical Advisory Criteria) states that a driver who is taking anti-seizure medication or has not fully recovered from the known medical condition that caused a seizure is not qualified to operate a commercial motor vehicle. Medical Advisory Criteria § 391.41(b)(8) at 411.

> The Supreme Court and the Third Circuit have held that an employer may, consistent with the ADA, apply DOT's physical

qualification standards to its employees. See *Albertson's, Inc. v. Kirkinburg*, . . . ("When Congress enacted the ADA, it recognized that federal safety rules would limit application of the ADA as a matter of law."); *Coleman v. Keystone Freight Corp.*, 142 Fed. App'x. 83, 87 (3d Cir. 2005) (ADA did not prohibit firing Plaintiff where he failed to meet DOT regulations). The Tenth Circuit has similarly held that employers may rely on the DOT's Medical Advisory Criteria in establishing qualification standards:

> We have little difficulty concluding that Defendant may rely on a reasonable interpretation of DOT's Medical Advisory Criteria, which undoubtedly are job-related and consistent with Defendant's safety and liability concerns, to establish physical requirements for its CMV operators, provided Defendant does so consistently and uniformly.

*Tate v. Farmland Indus.*, 268 F.3d 989, 994-95 (10th Cir. 2001). These DOT standards are particularly apposite in the instant case because they have been adopted by the Commonwealth in setting standards for the operation of commercial vehicles. See 67 Pa.Code § 229.1 (2007); 67 Pa.Code § 231.1 (2007).

*Clark*, 2008 WL 219223 at *9 (some citations omitted). *See also Albertson's, Inc. v. Kirkinburg, supra* (federal safety rules may limit application of ADA as a matter of law; employer could use compliance with applicable DOT safety regulations to justify visual-acuity job qualification standard, despite existence of experimental program by which DOT standard could be waived in an individual case"); *Coleman v. Keystone Freight Corp., supra* (plaintiff was not a qualified individual where he failed to meet DOT regulations regarding driving while taking certain medications that induced drowsiness and fatigue, and failed to prove he could perform essential functions of his job with or without a reasonable accommodation, i.e., that he could drive a tractor trailer while taking medications); *Ward v. Skinner*, 943 F.2d 157 (1st Cir. 1991) (Breyer, J.), *cert. denied*, 503 U.S. 959 (1992) (epileptic taking anti-convulsant medicine not otherwise

qualified to drive commercial vehicles according to DOT regulations, even though risk may be small; broad safety generated requirement regarding physical limitations may be acceptable, *even* in lieu of individualized determination/ assessment) (citing post-*Arline* case, *Traynor v. Turnage*, 485 U.S. 535 (1988)); *Whitehead v. UPS*, 387 Fed.App'x 16 (2d Cir. 2010) ("people with epilepsy cannot receive a D.O.T. medical card" and persons with "established medical history or clinical diagnosis of epilepsy" not physically qualified to drive a commercial motor vehicle, citing 49 C.F.R. § 391.41(b)(8)); *Smith v. UPS*, 2006 WL 3327072 (N.D.Ga. 2006) (persons with certain health conditions, such as drivers with medical history of epilepsy, current clinical diagnosis of epilepsy, or who are taking anti-seizure medication, are not qualified to drive DOT regulated vehicles).

The Court in *Clark* also found the Plaintiff to be a direct threat to the safety of others as well as himself. "If Plaintiff [Clark] had a seizure while driving a commercial vehicle, the harm could be catastrophic, as the DOT and SEPTA have recognized in formulating the physical standards for commercial drivers. Because Plaintiff is a direct threat to himself and others, he is not qualified, as a matter of law, to perform the essential functions of the safety sensitive position of Body Mechanic." *Id*. at 2008 WL 219223, *10.

"Ultimately, if the Court finds that the disabled person possesses a 'direct threat' to the health, safety and welfare of others, the Court may find that such a person is not 'otherwise qualified' under either the Rehabilitation Act or the ADA." *Goldstein v. Costco Wholesale Corp.*, 2003 WL 21954039, *3 (E.D.Va. 2003) (citing *Doe v. Woodford County Bd. of Educ.*, 213 F.3d 921, 925 (6th Cir.2000)). *See also Arline*, 480 U.S. at 287-88 ("person who poses a significant risk of communicating an infectious disease to others in the workplace will not be otherwise qualified for his or her job if reasonable accommodation will not eliminate that risk.

The [Rehabilitation] Act would not require a school board to place a teacher with active, contagious tuberculosis in a classroom with elementary schoolchildren."); *Wood v. Omaha School Dist.*, 25 F.3d 667 (8th Cir. 1994) (insulin-using diabetics who were employed as school van drivers were not "otherwise qualified" and could not be reasonably accommodated in light of testimony that hyperglycemia creates risk of sudden loss of vision and that hypoglycemia produces danger of sudden loss of consciousness); *Pennsylvania State Troopers Ass'n v. Miller*, 621 F.Supp.2d 246, 256 (M.D.Pa. 2008) ("other courts in this Circuit have recognized that 'ensuring members' fitness for duty is a business necessity vital to the operation" of police departments); *F.F. v. City of Laredo*, 912 F.Supp. 248 (S.D.Tex. 1995) (city bus driver diagnosed with bipolar mental disorder was not "otherwise qualified" as required by the Rehabilitation Act because driver's operation of passenger bus threatened public safety whether or not he was taking his prescribed medication, and safety risk could not be eliminated).

### d.  Direct threat assessment

PSP determined that Plaintiff posed a direct threat to himself, fellow troopers and the public if he were to perform critical duties within five years of his last seizure and while on anti-seizure medications. In the framework provided by EEOC regulation, PSP's risk assessment was as follows:

(1) The duration of the risk. The risk that Plaintiff might suffer another seizure at a rate higher than that for the general population runs for five years after his last seizure, or until August, 2015, and the risk of disastrous consequences should he have another seizure while performing critical duties runs for as long as each shift lasts. Even if he was not performing a critical duty at the time he experienced a seizure, the risk remains operative as he could be called to a critical duty at any time and rapid response would be required.

(2) The nature and severity of the potential harm. The potential harm to persons and property of a seizure occurring while in performance of a critical duty, say a high speed chase or apprehension of a fleeing suspect, cannot be overstated – it would be calamitous.

(3) The likelihood that the potential harm will occur. There is disagreement between the parties as to the probability of recurring seizures. Drs. Marrone and Sperling put the risk for Plaintiff, considering his medical and treatment history and the medical research and literature, at 75% to 90%, decreasing as the years pass until, at five years, the odds of seizure would approximate those of the general public. Dr. Jahromi estimated that the odds of Plaintiff having another seizure was one or two percent, the same odds as an average person, but less than 50%. Unlike Drs. Marrone and Sperling, however, Dr. Jahromi did not reference any medical literature, studies or research as his source for this imprecise estimate. The Court finds sufficient evidence in the record on summary judgment to support PSP's determination that the likelihood of Plaintiff experiencing additional seizures, given his permanent brain damage and history of multiple seizures, some while on medication, was significantly higher than that of the average person at the time the termination decision was made.

(4) The imminence of the potential harm. Seizures generally, and Mr. Coleman's in particular, occur unexpectedly and unpredictably, without little or no warning. If Plaintiff were to experience another seizure, the harm would be immediate.

**e.      Blanket exclusions**

Plaintiff contends PSP's policy of not allowing members who have been seizure free for five years or who take anti-seizure medication to perform critical duty amounts to a prohibited blanket exclusion, in the absence of an independent medical examination by Dr. Marrone or other Medical Officer for PSP. ADA and Rehabilitation Act jurisprudence demand utmost

scrutiny of an employer's blanket exclusions, which are, as a general rule, discouraged. *See Gaus v. Norfolk So.Ry. Co.*, 2011 WL 4527359, *28 (W.D. Pa. 2011) (individualized assessment "absolutely necessary to protect individuals with disabilities from unfair and inaccurate stereotypes and prejudices and . . . courts have stressed that blanket exclusions are to be given the utmost scrutiny"); *Stillwell v. Bd. of Police Comm'rs*, 872 F. Supp. 682, 687 (W.D. Mo. 1995) (city's blanket exclusion of one-handed police officers violated the ADA); Sarsycki v. UPS, 862 F.Supp. 336, 341 (W.D. Okla. 1994) (blanket regulation that barred insulin-dependent diabetics from driving motor vehicles under 10,000 pounds, without consideration of the individual's specific limitations or whether a reasonable accommodation was available, was impermissible); *Bombrys v. City of Toledo*, 849 F. Supp. 1210 (N.D. Ohio 1993) (city enjoined from implementing blanket exclusion for persons with insulin-dependent diabetes from employment as police officers).

A strong case could be made that PSP's Seizure Protocol was the sort of qualification standard that may properly be applied in blanket fashion, without individualized assessment.  In *Ward v. Skinner*, 943 F.2d 157 (1st Cir. 1991), *cert. denied*, 503 U.S. 959 (1992), the plaintiff had a history of epileptic seizures which were controlled by anticonvulsant medications, and had no seizures at all for six years. Nevertheless, after it discovered his epileptic history his employer suspended him from his job, as DOT's regulation required. 49 C.F.R. § 391.41(b)(8) (1977) ("A person is physically qualified to drive a motor vehicle if that person . . . [h]as no established medical history or clinical diagnosis of epilepsy."). DOT's intent with this section was "to permanently disqualify a driver who has a medical history or clinical diagnosis of epilepsy." *Ward*, 943 F.2d at 159 (quoting 42 Fed.Reg. 60082 (1977)).

33

The Court of Appeals for the First Circuit rejected plaintiff's argument that DOT failed to give his case the "individualized consideration" that the Rehabilitation Act requires, see . . . *Arline*, 480 U.S. 273 (1987), and that, had it done so, it would have found him to be a safe driver and waived the 'anti-epileptic' rule." *Id*. at 159 (Breyer, J.). The Court of Appeals concluded that "DOT could reasonably decide not to investigate Mr. Ward's case further and that it could rely upon the Task Force's general, recommended rule in denying him a waiver from its rule forbidding those with a history of epilepsy to drive commercial vehicles in interstate commerce." *Id*. at 165. After examining the record, the Court concluded "DOT's refusal, without making further 'individualized inquiry,' to grant a waiver was reasonable," even though the "question about whether seizure-free epileptics taking anticonvulsant medicine should be authorized to drive commercial vehicles is obviously a close one." *Id*. at 163.

Similarly, in *Davis v. Meese*, 692 F.Supp. 505 (E.D.Pa. 1988), the District Court held that the FBI policy that precluded insulin-dependent persons with diabetes from applying for the job positions of special agent and investigative specialist did not violate the Rehabilitation Act. Recognizing that blanket exclusions are generally unacceptable under the Act, the Court found that legitimate physical requirements are proper if they are directly connected with and substantially promote legitimate safety and job performance concerns, and are tailored to those concerns, notwithstanding that they affect a group or class rather than a single individual.

This Court need not resolve whether the PSP Seizure Policy falls within the exception to the general rule proscribing so-called blanket exclusions, because the record contradicts Plaintiff's position that PSP applied its Seizure Policy in blanket fashion. To the contrary, Dr. Marrone and PSP decision-makers clearly conducted an independent and comprehensive review of Plaintiff's medical history in the aftermath of his car accident, as discussed in the next section.

34

**f.   Individual assessment**

Initially, individual assessment is built into the Seizure Protocol, which provides in part that a member/LEO member who experiences seizure activity, involuntary loss of consciousness or has been diagnosed with epilepsy, shall not be permitted to perform full duty "until he or she remains seizure free for a period of five years, on or off anti-seizure medication or other treatment. The specific duty restrictions *will be determined by the State Police Medical Officer for each individual case. Certain explained seizure activity may be excepted* by the State Police Medical Officer." Defendant's Appendix, Exhibit 5, PSP Seizure Protocol (ECF No. 36-5), at ¶ 2 (emphasis added).  Similarly, after a second episode, the member/LEO will not be permitted to perform full duty "until he or she is seizure free for a period of 5 years from the date of the most recent seizure,"  but *"[e]xception may be granted* by the State Police Medical Officer," who *in "the absence of any change* in the member/LEO's status/medical condition . . . *will review each case annually*." *Id.* at ¶¶ 4-5 (emphasis added).

In practice, Dr. Marrone can and has suspended the protocol when good medical evidence confirms there is no safety issue. *Id*. at pp. 42-43, 48-50, 53.  Moreover, PSP's Seizure Protocol and policy regarding the use of anti-seizure medication such as Keppra states that certain explained seizure activity may be excepted by the State Police Medical Officer, and Dr. Marrone has in fact made exceptions after individualized assessment was made. Defendant's Appendix, Exhibit 2, Dr. Marrone Deposition Transcript (ECF No.  36-2), at 42-43, 48-50 of 166.

Dr. Marrone obtained and reviewed Mr. Coleman's medical records, including records of his treatment by Dr. Jahromi and his hospitalization, followed his condition throughout 2010, discussed him with HR staff, spoke with Dr. Jahromi, plaintiff's treating neurologist, and based

35

his recommendation on objective medical evidence concerning Mr. Coleman's risk of seizure recurrence under all the circumstances. *Id.* at 18-20, 60-76, 98, 110-130, 132-138; Defendant's Appendix, Exhibit 13, Probation Medical Records (ECF No. 36-13). As doctors routinely do, Dr. Marrone and Dr. Sperling each made an individual assessment of Plaintiff's seizure disorder through review of medical records generated by other providers, and Dr. Marrone also consulted with Plaintiff's treating physician.

Dr. Marrone's and PSP's assessment of Plaintiff's medical condition disclosed the following undisputed facts. Dr. Marrone knew Plaintiff had been seizure free from August 2010 until the termination decision in February 2011, that Dr. Jahromi had released Plaintiff to return to unrestricted duty, and that Dr. Jahromi had reported, based on Plaintiff's and his wife's accounts, that Plaintiff had no side effects from his anti-seizure medication since August 2010.

On the other side of the scales, Dr. Marrone learned that Plaintiff's disorder was caused by permanent brain damage, scarring of both frontal lobes which triggered sharp waves, electrical irritability shown on his EEG. Dr. Marrone also learned that Plaintiff had at least three seizure episodes, the first two being of the grand mal type and the last two occurring despite the anti-seizure medications he was taking. Moreover, Plaintiff did not report his August 2010 seizure until November 2010, which in Dr. Marrone's view, cast some doubt on Plaintiff's subjective reporting that he had no adverse side effects from his medication.

Dr. Sperling's evaluation and review of Plaintiff's medical condition, and his diagnosis and prognosis, fully supported Dr. Marrone's medical opinion. While Dr. Marrone did not have the benefit of Dr. Sperling's February 2011 report at the time of the termination decision, it supplies substantial objective support for Dr. Marrone's prognosis and assessment of risk as being at the high end of the range, i.e., approaching a 90% chance of another seizure. Dr.

36

Sperling opined that Plaintiff's second and third seizures while taking anti-seizure medications did "not augur especially well for the future," and he advised Plaintiff that "there is a difference between ordinary driving and working as a state trooper," and that he should avoid moving equipment, heights, and swimming without a lifeguard, etc."

PSP's termination decision was not the result of rote application of the Seizure Policy. PSP conducted a thorough, individualized assessment of Plaintiff's condition in light of its Seizure Policy, and Dr. Marrone determined there was no medical justification for making an exception to the five year protocol for Plaintiff. It is not for the courts to second guess PSP's medical officers and decision makers when there is adequate support on the record for their determination that Plaintiff was not qualified to perform the essential functions of the job.

**Step 2. Plaintiff cannot perform the identified critical duties, which are essential functions of a PSP trooper, with or without accommodation**

   **a.  Essential functions**

Whether a "particular function is essential 'is a factual determination that must be made on a case by case basis [based upon] all relevant evidence.'" *Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 148 (3d Cir. 1998) (en banc) (quoting 29 C.F.R. § 1630.2(n)). "The term 'essential functions' means the fundamental job duties of the employment position the individual with a disability holds or desires, and does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1). The EEOC regulations provide a comprehensive list of factors and considerations useful in deciding whether a particular function or duty is an "essential function" within the meaning of the disability statutes, 29 C.F.R. § 1630.2(n)(2, 3).  Detailed analysis of these factors and considerations is not necessary here, however, as there is no dispute that the essential functions of a PSP trooper include the "Critical Duties" listed in the Seizure Protocol,

namely: "Patrol duty; exposure to confrontational situations; duties that entail alertness, reasoning and decision-making; and communications/desk duties. Additionally, critical duty includes any activity that, if performed improperly or not at all, would place that individual, other members, liquor enforcement officers, civilian employees or the general public in danger." Defendant's Appendix, Exhibit 5, PSP Seizure Protocol (ECF No. 36-5), at ¶ 7.

### b. Present potential for harm affecting ability to perform critical functions

Plaintiff is certainly physically capable of performing all duties of a PSP trooper when he is not experiencing a seizure He is not, however, capable of performing critical functions when he is having a seizure, and the present risk of future harm should he suffer another seizure, sudden and unexpected, while engaged in a critical function of the job, poses an unacceptably great risk of severe damage to himself, other troopers and the general public.

The job of a police officer is uniquely demanding. *McDonald v. Pennsylvania State Police,* 2012 WL 5381403, *12 (W.D.Pa.), *rev'd on other grounds* 485 Fed. App'x 612 (3d Cir. 2012). Police offers are often forced to make split second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation. *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 396-97 (1989) (considering parameters for excessive force claims in the section 1983, Fourth Amendment context)). *Accord Watson v. City of Miami Beach*, 177 F.3d 932, 935 (11th Cir. 1999) (police departments "place armed officers in positions where they can do tremendous harm if they act irrationally"). Police officers are likely to encounter extremely stressful and dangerous situations during the course of their work. *Diaz v. City of Philadelphia*, 2012 WL 1657866, at *13 (E.D.Pa. 2012) (citing *Brownfield v. City of Yakima,* 612 F.3d 1140, 1146–47 (9th Cir.2010)).

38

It is the real and present risk of harm that renders Plaintiff unable to perform essential, critical functions of a PSP trooper. This is not a novel proposition. *See, e.g. Donahue v. Consol. Rail Corp.,* 224 F.3d 226, 230-31 (3d Cir. 2000) (epileptics operating potentially dangerous machinery could not perform the job of train dispatcher without posing a significant risk to others; where threatened harm is grievous, even a small risk may be significant and unacceptable); *McFarland–Peebles v. Virginia Dep't of Motor Vehicles,* 352 Fed.App'x 848, 849 (4th Cir. 2009) (recurring seizures "significantly interfere with, if not negate, employee's ability to perform the essential functions of her job"); *Lapier v. Prince George's County,* 2013 WL 497971, *3 (D.Md. 2013) (as measure of job fitness, employers may require applicants or cadets to complete training runs in a certain amount of time; no accommodation exists that would render applicant able to complete a required fitness run in a minimally acceptable time, and "no reasonable juror could conclude that Plaintiff could perform the essential functions of a police officer") (citing *Champ v. Baltimore County,* 884 F.Supp. 991, 997 (D.Md. 1995) (responding to emergencies and making forceful arrests are essential functions of a police officer); *Diaz,* 2012 WL 1657866, at *10 ("Since Plaintiff satisfies the prerequisites for the position, we look to whether Plaintiff can perform the essential functions of the job. Plaintiff is a patrol officer. . . . [but] at this point in her career, Plaintiff cannot function as a patrol officer" even when symptoms were not manifest unless and until stressors triggered a debilitating psychological reaction"); *Olsen v. Capital Region Med. Ctr.,* 2012 WL 1232271, *6 (W.D.Mo. 2012) (plaintiff not qualified individual under the ADA or the [Missouri counterpart] because she could not perform the essential functions of her position while she was experiencing an uncontrolled and unpredictable seizure); *Haas v. Wyoming Valley Health Care Sys.,* 553 F.Supp.2d 390 (M.D.Pa. 2008) (overturning jury verdict, court finds surgeon with bi-polar

39

condition could not perform essential functions as orthopedic staff surgeon with or without a reasonable accommodation, because the risk of having an episode while operating posed a significant, direct threat to the health and safety of patients); *Salmon Pineiro v. Lehman,* 653 F.Supp. 483, 493 (D.P.R. 1987) (government was not required to make reasonable accommodations for criminal investigator who met all the academic and educational requirements but was terminated because of his epileptic condition where he refused to consider nonhazardous position; investigator could not meet legitimate physical, safety related requirements of the job).

### D. Reasonable Accommodation

Under the disability discrimination statutes, "an employer discriminates against a qualified individual with a disability when the employer does not make reasonable accommodations to the known physical or mental limitations of the individual unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the employer." *Taylor v. Phoenixville School Dist.,* 184 F.3d 296, 306 (3d Cir. 1999) (citing 42 U.S.C. § 12112(b)(5)(A)). Title I of the ADA states that discrimination includes "not making reasonable accommodations to the known physical or mental illness of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity . . . ." 42 U.S.C. §12112(5)(A). Title I also prohibits denial of "employment opportunities to a job applicant or employee" who is an "otherwise qualified" individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant. 42 U.S.C. §12112(5)(B). See also 29 C.F.R. §1630.9,

"Not making reasonable accommodation." Reasonable accommodation standards set forth in the ADA have been adopted for evaluating accommodation issues under the Rehabilitation Act. See 29 U.S.C. § 794(d).

The key is *reasonable*. When making an accommodation claim, an employee can succeed under the ADA or Rehabilitation Act *only* if the employee can demonstrate that a specific, reasonable accommodation would have allowed him to perform the essential functions of his job. *Boandl v. Geithner*, 752 F.Supp.2d 540, 559 (E.D.Pa. 2010) (citing *Donahue*, 224 F.3d at 232). "[E]mployers are not required to modify the essential functions of a job in order to accommodate an employee." *Id.*   Both parties "have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith." *Mengine v. Runyon*, 114 F.3d 415, 420 (3d Cir. 1997).[6]

An employee claiming failure to accommodate must "demonstrate that there were *vacant, funded positions whose essential duties he was capable of performing*, with or without reasonable accommodation, and that these positions were at an equivalent level or position" as the job he seeks. *Gaul*, 134 F.3d at 580-81 (emphasis added). Reasonable accommodations include "measures such as 'job restructuring, part-time or modified work schedules . . . acquisition or modification of equipment or devices . . . and other similar accommodations for individuals with disabilities.'" *Freeman v. Chertoff*, 604 F.Supp.2d 726, 734 (D.N.J. 2009) (citing 42 U.S.C. § 12111(9)(B)).

---

[6] An employer is required to "initiate an informal, interactive process with the employee in need of an accommodation" in order to determine "the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome those limitations." *Taylor*, 184 F.3d at 311–312; *Mengine*, 114 F.3d at 419. An employee thus may state a claim for failure to accommodate based on an employer's failure to engage in the interactive process. *See Colwell v. Rite Aid Corp*., 602 F.3d 495, 504 (3d Cir. 2010) (citing *Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 761 (3d Cir. 2004)). Mr. Coleman does not claim that PSP failed to engage in the interactive process, and the record shows PSP was fully engaged in this process.

There are limits to an employer's statutory obligations to restructure work assignments and modify schedules, however.  The disability statutes do not require an employer to create a new position in order to accommodate an employee with a disability, or to transform a temporary light duty position into a permanent position. *Turner v. Hershey Chocolate U.S.*, 440 F.3d 604, 614 (3d Cir. 2006) (citing *Buskirk v. Apollo Metals*,  307 F.3d 160, 169 (3d Cir. 2002). *See also Mengine*, *supra* (postal service not required to transform temporary light duty jobs into permanent jobs to accommodate carrier's hip-related disability); *Gaul*, 134 F.3d at 581 (plaintiff's proposed accommodation that employer transfer him away from co-workers subjecting him to prolonged and inordinate stress was not reasonable accommodation for employee's depression and anxiety-related disorders, and essentially asks the court to establish conditions of employment, "most notably, with whom he will work"); Kralik v. Durbin, 130 F.3d 76, 83 (3d Cir. 1997) ("requested accommodation is unreasonable because it would require the employer to violate its collective bargaining agreement and run the risks that the violation entails"); *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 526 (7th Cir. 1996) (employee's solution to return to work under a different supervisor is a decision that "remains with the employer. In essence, [the employee] asks us to allow her to establish the conditions of her employment, most notably, who will supervise her. Nothing in the ADA allows this shift in responsibility."); *Lapier v. Prince George's County*,  2013 WL 497971 at *4 (plaintiff could argue the County "should have kept him on light duty permanently, [but] this argument would fail because permanent, light-duty positions would effectively eliminate the essential functions of chasing suspects on foot and making forcible arrests"); *Olsen*, 2012 WL 1232271 at *6 (court rejects employee's argument that she could perform the essential functions of her mammographer technologist position with an accommodation of intermittent leave, i.e., going home for rest of day following

a seizure, and usually the next day as well, as not reasonable; "due to the unique requirements of plaintiff's position, it was not possible for her to carry out the essential functions of her position, during the time that she was having a seizure. Plaintiffs' arguments regarding intermittent leave really address the time period after the seizure was over, when plaintiff needed to recover. Therefore, the Court finds that plaintiff was not a qualified individual"); *Diaz*, 2012 WL 1657866, at *12 (city not required to accommodate officer "by removing an essential function or restructuring a job so as to avoid [implicating the disability], but, rather, they are to provide an accommodation so as to enable the employee to perform such a function.") (quoting *Skerski*, 257 F.3d at 285 n. 4).

Plaintiff has not shown there are any vacant, funded positions he was capable of performing that would enable him to perform the essential functions of a PSP trooper. The accommodation he requests is that he be allowed to continue on limited, non-critical duty until he has been seizure free for five years or that PSP waive the requirement. To comply with that request, PSP would have to create a new position in order to accommodate Plaintiff or to transform the temporary, light duty position he had been working while a probationary trooper into a permanent position. Such a requested accommodation is unreasonable.

### E.  Summary judgment in PSP's favor on Rehabilitation Act is appropriate

For all of the foregoing reasons, the Court finds, as a matter of law, that PSP did not discriminate against Plaintiff on the basis of his disability in terminating him pursuant to its Seizure Protocol because Plaintiff cannot demonstrate that he was otherwise qualified to perform essential duties of a PSP trooper. Accordingly, his Rehabilitation Act claim must fail, and summary judgment will be entered for PSP on Count I.

**Count II.  Title II of the American with Disabilities Act**

Title II of the ADA states "No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S. C. §12132. Title II does not create a private right of action for employment discrimination for employees of the public services, programs, or activities.

In *Blessing v. Freestone*, 520 U.S. 329, 340-41 (1997), the Supreme Court of the United States set forth three factors to determine whether a statute confers a federal cause of action upon an individual: (1) did Congress intend the statutory provision in question to benefit the plaintiff; (2) is the right asserted so "vague and amorphous" that its enforcement would strain judicial competence; and (3) does the statute unambiguously impose a binding obligation on the states. In *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002), the Court held that for a statute to create private rights, its text must be "phrased with an unmistakable focus on the benefited class." *Id.* at 284 (emphasis in original) (quoting *Cannon v. Univ. of Chicago*, 441 U.S. 667, 691 (1979)). *See also Sabree ex rel. Sabree v. Richman*, 367 F.3d 180, 189 (3d Cir. 2004) (Medicaid statute requiring states to provide medical assistance covering medical services from an intermediate care facility for persons with mental retardation with reasonable promptness unambiguously conferred individual federal rights enforceable under section 1983).

Title II's first clause provides that no qualified individual with a disability should be denied the benefits of the services, programs, or activities of a public entity. Absent, though, is any explicit/rights-creating terms indicating that the words "services, programs or activities," encompasses employment discrimination. Congress could have provided such explicit/rights-creating language within Title II's first clause; however, they chose not to do so. As the Supreme

Court in *Gonzaga* stated, where a "statute does not include this sort of explicit 'right- or duty-creating language,' we rarely impute to Congress an intent to create a private right of action." *Gonzaga*, 536 U.S. at 284 n.3 (citing *Alexander v. Sandoval*, 532 U.S. 275, 288 (2001)) (existence or absence of rights-creating language is critical to the Court's inquiry).

Applying the *Blessing/ Gonzaga* analysis, the majority of federal courts hold that the words "services, programs or activities" of Title II of the ADA do not encompass claims made for employment discrimination by employees of those services, programs or activities. Recognizing that the Court of Appeals for the Third Circuit has not yet addressed the issue, United States District Judge David S. Cercone considered whether Title II of the ADA creates a private right of action for employment discrimination. *Hemby- Grubb v. IUP*, 2008 WL 4372937 (W.D. Pa. 2008).

After carefully examining the persuasive reasoning of *Zimmerman v. Oregon Dept. of Justice*, 170 F. 3d 1169 (9th Cir. 1999), the structure of the ADA, the ordinary meaning of the words "services, programs, or activities," and surveying other district courts within the Third Circuit, Judge Cercone concluded that an employment discrimination action was not cognizable under Title II, and that it would "be a tortured reading of the ADA as a whole to construe that, after covering employment in Title I, Title II likewise was intended to encompass employment actions without explicitly saying so." *Id.* 2008 WL 4372937 at *8-*9. *Compare Nelson v. Pa. Dep't of Pub. Welfare,* 244 F. Supp. 2d 382, 388-89 (E.D. Pa. 2002) ("Given that . . . Congress expressly provided for employment discrimination in Title I [of the ADA], . . . Title II fails to mention employment, . . . the 'services, programs, or activities' discussed in Title II are not common synonyms for employment, and . . . neither Congress nor the courts have equated employment with 'services, programs, or activities' in this legal context, I cannot reasonably

45

conclude that Title II was intended to provide a cause of action for victims of employment discrimination"); *McSherry v. Dep't of Labor & Indus.*, 2006 WL 463157, *7 (M.D. Pa. 2006) ("For all of the foregoing reasons, [this] Court agrees . . . that the ADA clearly expressed Congress' intent that employment claims are to be governed exclusively by Title I, and no valid cause of action for employment discrimination can be brought pursuant to Title II of the ADA"); *Pennsylvania State Troopers Ass'n v. Pennsylvania*, 2007 WL 853958, *6-8 (M.D. Pa. 2007) ("This court concludes that the plain language of Title II does not create a cause of action for employment discrimination. . . . Employment is not a program, service, or activity that the State Police provides to its troopers. If anything, the troopers are providing their services, as employees, to the State Police as their employer."); *with Bracciale v. City of Philadelphia,* 1997 WL 672263, *7 (E.D.Pa. 1997) ("Title II covers employment discrimination by a public entity"); *Benedum v.Franklin Tp. Recycling Cntr,* 1996 WL 679402, *5 (W.D. Pa. Sept. 12, 1996) ("Although not expressly stated in § 12132, regulations adopted by the Department of Justice establish that Title II's prohibitions against discrimination by public entities includes employment discrimination").

This Court is persuaded by Judge Cercone, *Zimmerman*, and the district court cases within this circuit discussed above (representing the majority view) that have found no private right of action in the employment context in Title II, and that Congress did not intend Title II of the ADA to create a private right of action for individuals pursuing employment discrimination. *See also Elwell v. Bd. of Regents of the Univ. of Oklahoma*, 693 F.3d 1303, 1309 (10th Cir. 2012) (Title II of the ADA does not create a cause of action for employment discrimination; "each title [of the ADA] does important and independent work – work that would be diminished, duplicated, even rendered superfluous were we to read Title II as covering employment

46

discrimination."); *Decker v. Univ. of Houston*, 970 F. Supp. 575, 578 (S.D. Texas 1997); *Larramendy v. San Mateo County Transit Dist.*, 1998 WL 456283, at *3 n.1 (N.D. Cal. 1998); *Iskander v. Rodeo Sanitary Dist.*, 1995 WL 56578, at *9 (N.D. Cal. 1995); *Brettler v. Purdue Univ.*, 408 F. Supp. 2d 640, 655 (N.D. Ind. 2006).

Consequently, Plaintiff is precluded from asserting an employment discrimination claim under Title II of the ADA against PSP, a public entity, and summary judgment will be entered in PSP's favor on Count II of the Amended Complaint.

**Count III.  Title VII of the Civil Rights Act of 1964**

Plaintiff alleges that he was discriminated against by PSP on the basis of race, in violation of Title VII. To make a *prima facie* case for employment discrimination under Title VII, the plaintiff must show that he: (1) belongs to a protected class; (2) was qualified for the position in question; (3) was subjected to an adverse employment action; (4) under circumstances that give rise to an inference of prohibited discrimination. *Wood v. Univ. of Pittsburgh*, 395 F. App'x 810, 814 (3d Cir. 2010).  As previously noted, plaintiff is not "otherwise qualified" to receive long-term limited duty status, since the plaintiff has not completed the twelve month field training program.

Defendant also argues plaintiff cannot establish circumstances creating an inference of discrimination. Plaintiff counters with evidence that the decision makers were aware of the plaintiff's race, since they had five different color photographs of him, and that PSP accommodated similarly situated troopers by placing them on long-term limited duty, all of whom were white. However, the troopers placed on long-term limited duty had completed the mandatory twelve month probationary program, and thus, the accommodated white troopers are not valid comparators.

The question of whether other employees are "similarly situated" is fact-intensive, *Monaco v. American Gen. Assur. Co.,* 359 F.3d 296, 306 (3d Cir. 2004), but the operative facts here are not in dispute. Each white trooper identified by Plaintiff was beyond probation status and had been appointed as a full-fledged trooper, and was fully covered under the CBA and side agreements providing for limited duty to be offered to troopers if available. *See, e.g., Moore v. Shinseki*, 2011 WL 5075164, *10 (E.D.Pa. 2011) ("Moore fails to proffer any evidence of favorable treatment of other similarly situated employees not exercising the same right. As discussed above, the comparators that Moore suggests are not true comparators and, in any case, relate only to his race or gender discrimination, not to the exercise of protected activity under Title VII."); *Haskins v. Christiana Care Health Serv.,* 701 F.Supp.2d 623, 629 (D.Del. 2010) (rejecting plaintiff's claim that she had been disciplined more harshly than her white counterparts, court holds: "It is true that 'similarly situated' employees need not be 'identically situated' in order to be valid comparators. . . . Courts have recognized, however, that in order for an co-employee to be an appropriate comparator she should hold a similar position, report to the same supervisor, possess a similar disciplinary record, and engage in the same type of misconduct as the plaintiff.").

Plaintiff is unable to support elements of his *prima facie* race based discrimination claim under Title VII, and summary judgment must be granted in favor of PSP on Count III of the Amended Complaint1 plaintiff's Title VII claim of discrimination on the basis of race.  **VI.**

**V.**      **Conclusion**

Based upon the foregoing, the Court finds no genuine issue of materials facts as to necessary elements of each of Plaintiff's claims.  Summary judgment is, therefore, appropriate and will be entered in favor of PSP.

A separate order will follow.


*/s Cynthia Reed Eddy*
Cynthia Reed Eddy
United States Magistrate Judge


cc:  all counsel of record